**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| KIAN KELLEY-CHUNG | ) | |
| 9576 Farewell Rd. | ) | |
| Columbia, MD 21045 | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ACTING CHIEF OF POLICE | ) | |
| ROBERT J. CONTEE, III | ) | |
| District of Columbia Metropolitan Police Department | ) | |
| (in his official capacity) | ) | Case No. _____ |
| 300 Indiana Avenue, NW | ) | |
| Washington, DC 20001 | ) | |
| | ) | |
| DISTRICT OF COLUMBIA METROPOLITAN | ) | |
| POLICE DEPARTMENT | ) | |
| 300 Indiana Avenue, NW | ) | |
| Washington, DC 20001 | ) | |
| | ) | |
| DISTRICT OF COLUMBIA | ) | |
| A Municipal Corporation | ) | |
| 441 Fourth Street, N.W. | ) | |
| Washington, DC 20001 | ) | |
| | ) | |
| LIEUTENANT JASON BAGSHAW | ) | |
| District of Columbia Metropolitan Police Department | ) | |
| (in his official and individual capacity) | ) | |
| 300 Indiana Avenue, NW | ) | |
| Washington, DC 20001 | ) | |
| | ) | |
| OFFICER S. McCLOSKEY | ) | |
| District of Columbia Metropolitan Police Department | ) | |
| (in his official and individual capacity) | ) | |
| 300 Indiana Avenue, NW | ) | |
| Washington, DC 20001 | ) | |
| | ) | |
| OFFICER D.L. BROWN | ) | |
| District of Columbia Metropolitan Police Department | ) | |
| (in his official and individual capacity) | ) | |
| 300 Indiana Avenue, NW | ) | |
| Washington, DC 20001 | ) | |
| | ) | |

OFFICERS AND OFFICIALS JOHN DOE, 1-10          )
District of Columbia Metropolitan Police Department   )
(in their official and individual capacities)         )
300 Indiana Avenue, NW                             )
Washington, DC 20001                               )
                                                   )
SERVE:                                             )
The Honorable Mayor Muriel Bowser                  )
Executive Office of the Mayor                       )
1350 Pennsylvania Avenue, NW                        )
Washington, DC 20004                               )
                                                   )
Karl A. Racine, Attorney General                   )
Office of the Attorney General                      )
 for the District of Columbia                       )
400 6th Street, NW                                 )
Washington, DC 20001                               )
                                                   )
                          Defendants.              )
                                                   )
_____      )

## COMPLAINT FOR DECLARATORY RULING, INJUNCTIVE RELIEF, ACTUAL DAMAGES, PUNITIVE DAMAGES, AND ATTORNEY'S FEES; JURY TRIAL DEMANDED

KIAN KELLEY-CHUNG, by and through undersigned counsel, submits this Complaint against Robert J. Contee, III, Acting Chief of the District of Columbia Metropolitan Police Department; the District of Columbia Metropolitan Police Department; the District of Columbia; District of Columbia Metropolitan Police Department Lieutenant Jason Bagshaw; District of Columbia Metropolitan Police Department Police Officers S. McCloskey and D.L. Brown; and District of Columbia Metropolitan Police Department Police Officers and Officials John Does 1-10, whose identities Plaintiff anticipates discovering in connection with this action. In support of his claims, Plaintiff alleges as follows:

## INTRODUCTION

1.     The First Amendment's protections for freedom of speech and of the press give journalists and citizens the right to take still or moving photographs from locations open to the

public of events occurring in public settings, including any related police presence and activity. This well-established legal principle has long been enshrined in police department policies across the country – including those of the District of Columbia Metropolitan Police Department – but sometimes, "[w]hen wrongdoing is underway, officials have great incentive to blindfold the watchful eyes of the Fourth Estate." *Index Newspapers LLC v. City of Portland*, --- F. Supp. 3d ---, 2020 WL 4883017, at *1 (D. Or. Aug. 20, 2020), *emergency stay denied sub nom. Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817 (9th Cir. 2020).

2.     In too many instances, the police have swept up newsgatherers and photo-journalists as part of dragnet arrests, typically made without probable cause, for purposes of quelling legitimate protest activity, along with the press' coverage of it.  Journalists covering public events – such as the protests over the killing of Mr. George Floyd and others by the police, and of police brutality generally – have been subjected to arrest, seizures detention, and physical mistreatment, simply for practicing their profession.

3.     Courts have often had to remind the police that the "right to film government officials, including law enforcement officers, in the discharge of their duties in a public space is a basic, vital, and well-established liberty safeguarded by the First Amendment." *Glik v. Cuniffe*, 655 F.3d 78, 85 (1st Cir. 2011).  "Gathering information about government officials in a form that can readily be disseminated to others serves a cardinal First Amendment interest in protect-ing and promoting 'the free discussion of governmental affairs.'"  *Id*. at 82 (quoting *Mills v. Alabama*, 384 U.S. 214, 218 (1966)).

4.     The United States Department of Justice has reinforced this by filing "Statements of Interest" in cases litigated in the D.C.-Baltimore metroplex as part of its responsibility to enforce federal civil rights statutes that prohibit state and local law enforcement agencies from

engaging in conduct that deprives persons of rights under the Constitution and laws of the United States.  It explained that "[t]he right to record police officers while performing duties in a public place, as well as the right to be protected from the warrantless seizure and destruction of those recordings, are not only required by the Constitution," they "are consistent with our fundamental notions of liberty, promote the accountability of our government officers, and instill public confidence in the police officers who serve us daily."  Statement of Interest of the United States, *Sharp v. Baltimore City Police Dep't*, No. 1:11-cv-02888-BEL (D. Md. Jan. 10, 2012) at 1 (www.justice.gov/crt/about/spl/documents/Sharp_SOI_1-10-12.pdf); *see also* Statement of Interest of the United States, *Garcia v. Montgomery Cty.*, No. 8:12-cv-03592-TDC (D. Md. Mar. 4, 2013) (www.justice.gov/sites/default/files/crt/legacy/2013/03/20/garcia_SOI_3-14-13.pdf).

5.      Interference with these rights is a matter of vital concern, because "without journalists and legal observers, there is only the government's side of the story to explain why a 'riot' was declared and the public streets were 'closed' and whether law enforcement acted properly in effectuating that order."  *Index Newspapers LLC*, 2020 WL 4883017, at *19.

6.      This case involves the unlawful arrest, and seizure of photographic equipment and images and recordings, of a photojournalist and documentarian who, while covering protest activity in Washington, D.C.'s Adams Morgan neighborhood, was "kettled" with protesters in mass arrests effectuated by District of Columbia Metropolitan Police Department ("MPD") officers.  Mr. Kelley-Chung was swept up in the mass arrest despite his informing the police of his press status, and that he was actively covering the protests.  In connection with Mr. Kelley-Chung's arrest, officers seized his two cameras and their storage media, and his smartphone, which he was actively using to cover the protest in his capacity as a journalist and documentarian.

7.      In taking these actions, MPD officers and officials consciously and deliberately violated Plaintiff's constitutional and statutory rights, detained him for nearly a full day, then released him without pursuing any charges.  The MPD compounded the problem by failing to return Mr. Kelley-Chung's equipment and the images and recordings they contained at the time of his release, and further exacerbated the situation by holding his property for *ten weeks*, despite repeated requests and efforts seeking its return.  The Defendants' violations of law caused Mr. Kelley-Chung constitutional, personal, and economic injuries in multiple respects.

8.      Accordingly, this civil rights action seeks redress for the violation of Mr. Kelley-Chung's rights under the United States Constitution, and federal and state law.  It challenges the MPD's policy, custom and practice of obstructing First and Fourth Amendment rights of the press to gather, record, and disseminate news and information about events of public interest and of related police activity in public places.  This case presents a disturbing example of the type of police misconduct directed at photographers that courts and the Justice Department repeatedly have condemned.

## **PARTIES**

9.      Plaintiff Kian Kelley-Chung is an independent journalist and documentarian who most recently has actively covered public protests arising from the killing of George Floyd and police brutality throughout the summer of 2020.  Mr. Kelley-Chung is a National Press Photographers Association ("NPPA") member whose work has appeared in such publications as the *Washington Post*.

10.      Defendant Robert J. Contee, III is the Acting Chief of Police for the District of Columbia Metropolitan Police Department, a position he assumed on January 2, 2021 in succeeding Peter Newsham, who was at all times herein Chief of Police for the MPD.  Chief

Contee is responsible, and before him Chief Newsham was responsible, in whole and/or part, for creating, implementing, promulgating, and enforcing the policies, practices and/or customs complained of, including but not limited to those that prevented Mr. Kelley-Chung from engaging in lawfully protected and peaceful journalistic activity.  The actions of the Chief as alleged in this Complaint were taken under color of the laws of the District of Columbia.  He is sued in his official capacity.

11.     Defendant District of Columbia is a municipal corporation organized pursuant to the laws of the United States with the authority to sue and be sued and is the local government for the territory constituting the permanent seat of the federal government of the United States. It is authorized by law to maintain a Police Department that acts through its Chief, Defendant Robert J. Contee, III, currently serving in an acting capacity, and through the MPD officers and officials that he oversees.

12.     At all times relevant herein, Defendant District of Columbia among other things was responsible for operation of the Defendant District of Columbia Metropolitan Police Department, an agency of the local government, with the Defendant District of Columbia thus responsible for the policies, procedures, rules, regulations, and customs set forth and utilized for the supervision of the MPD and all MPD officers.

13.     Defendant Jason Bagshaw at all times relevant to this complaint was a duly appointed police officer with the MPD holding the rank of Lieutenant.  His actions alleged in this complaint were taken under color of the laws of the District of Columbia.  He is sued in his official and individual capacities.

14.     Defendant S. McCloskey at all times relevant to this complaint was a duly appointed police officer with the MPD.  His actions alleged in this complaint were taken under

color of the laws of the District of Columbia.  He is sued in his official and individual capacities.
Plaintiff anticipates learning his full name through discovery in this action.

15.     Defendant D.L. Brown at all times relevant to this complaint was a duly
appointed police officer with the MPD.  His actions alleged in this complaint were taken under
color of the laws of the District of Columbia.  He is sued in his official and individual capacities.
Plaintiff anticipates learning his full name through discovery in this action.

16.     Defendants Does 1-5, who are sued in their official and individual capacities, are
duly licensed police officers and employees of the Defendant District of Columbia and the MPD,
and were such at all times relevant herein, and effectuated Plaintiff's arrest and detention, and/or
the seizure and/or retention of his personal property.  Plaintiff anticipates learning their identities
through discovery in this action.

17.     Defendants Does 6-10, who are sued in their official and individual capacities, are
duly licensed police officers and employees of the Defendant District of Columbia and the MPD,
and were such at all times relevant herein, and are supervisory officials whose liability could
include their own culpable action or inaction in, or their acquiescence to, the constitutional
deprivations alleged here, and/or in conduct showing a reckless or callous indifference to the
rights of Plaintiff.  Plaintiff anticipates learning their identities through discovery in this action.

## JURISDICTION AND VENUE

18.     This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 2000aa-6(a), and
the First, Fourth, and Fourteenth Amendments to the United States Constitution.  This Court has
subject matter jurisdiction over all federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3),
and supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367.

19.     All prerequisites to bringing suit, if any, including those imposed by District of Columbia Code Ann. § 12-309, have been satisfied.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims herein occurred in this District and because all defendants reside in this District.

## FACTS

21.     On the evening of August 13, 2020, Mr. Kelley-Chung was in the Adams Morgan neighborhood of Washington, D.C. gathering information for a documentary as part of his coverage of public protests arising from the killing of George Floyd and police brutality throughout the summer of 2020.   Mr. Kelley-Chung was at the time accompanied by Andrew Jasiura, Plaintiff's partner in producing, among other things, documentaries through their production company, RXNIN LIFE, an independent artist collective that they operate.

22.     In covering the protests and police presence related to them, Mr. Kelley-Chung had in his possession and on his person professional photography equipment in the form of a Nikon D7100 camera body with an SD card and an 18-140mm lens, and a Fuji XT3 camera body with an SD card and 18-55mm lens, along with a black Samsung Galaxy S10e smartphone, all of which were in his rightful possession.   Both Mr. Kelley-Chung and Mr. Jasiura were wearing identical shirts bearing the RXNIN LIFE logo and were both known from earlier protests as members of the collective – *i.e.*, the press – to MPD officers on the scene on August 13, 2020.

23.     While Mr. Kelley-Chung was walking down the street filming and speaking with some of the protesters, MPD officers rushed and tackled someone nearby, and several people rushed in that direction, drawing Mr. Kelley-Chung's attention.   He hastened over to capture the moment, only to be shoved by an MPD officer.

24.     MPD officers then began surrounding individuals near 18th and Willard Streets in Adams Morgan, using a technique known as "kettling," a law enforcement tactic employed as an ostensible form of riot control that is specifically applied when police chose to criminalize the presence of individuals in public spaces, by surrounding protesters and refusing to let them leave.

25.     While MPD officers began making indiscriminate arrests of members of the public they had "kettled," Mr. Kelley-Chung continued documenting the scene, until he himself also was detained and arrested, despite clearly identifying himself as a journalist to the officers. This did not deter the officers from continuing with their arrest.

26.     At the same time, MPD officers refrained from arresting or detaining Mr. Jasiura because he was a member of the press covering the demonstration.  Mr. Jasiura stated that Mr. Kelley-Chung was also a member of the press, but to no avail.

27.     In response to the repeated statements identifying Mr. Kelley-Chung as a journalist, one nearby officer engaged in the kettling asked Mr. Jasiura if Mr. Kelley-Chung had a press pass on him, claiming such passes operate like a driver's license – *i.e.*, if a journalist does not have one on their person, they will not be treated as a member of the press – which is incorrect both as a matter of MPD policy and First Amendment law.

28.     Defendant Lieutenant Bagshaw was among the MPD officers on the scene of Mr. Kelley-Chung's arrest and, on information and belief, orchestrated the kettling of protestors, and of Mr. Kelley-Chung.

29.     Defendant Officer S. McCloskey grabbed Mr. Kelley-Chung and pushed him into the "kettle" of persons being arrested.

30.     Defendant D.L. Brown was Mr. Kelley-Chung's arresting officer.

31.     Other John Doe MPD officers were involved in Mr. Kelley-Chung's arrest and resulting detention.

32.     Mr. Kelley-Chung's arrest was utterly baseless and without probable cause.  The arresting officers could not have had a reasonable belief held in good faith that their conduct was lawful, nor any rational reason to believe Mr. Kelley-Chung was committing any crime or was about to commit any crime, but they nonetheless placed him under arrest.  The arrest was made without a warrant or legal justification.  *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006).

33.     The MPD officers intended to confine Mr. Kelley-Chung and deprive him of his liberty when they arrested and placed him in police custody without probable cause.

34.     In connection with his arrest, and despite being informed of Mr. Kelley-Chung's status as a journalist, MPD officers seized his photography equipment, their storage media, and the images and recordings they contained.

35.     Mr. Kelley-Chung was transported to the MPD station for the 7th District, where he was taken to holding and detained in MPD custody for over 18 hours before being released on August 14, 2020.

36.     The cell in which the MPD held Mr. Kelley-Chung, at the height of the coronavirus 19 pandemic, lacked soap, and he was denied access to hand sanitizer for several hours, until his constant requests during that time resulted in access.  Mr. Kelley-Chung was kept in a small cell with another detainee who lacked a mask and was not provided one by the MPD.

37.     Mr. Kelley-Chung later learned that the ostensible basis for his arrest was "felony rioting," a charge for which there was no arguable basis or probable cause.

38.     Upon release from MPD custody, Mr. Kelley-Chung was given a "No Paper/No Charges" slip indicating he had been arrested for felony rioting, but that no charges were being pursued.  A copy of the "No Paper/No Charges" slip is Exhibit 1 to this Complaint.

39.     Despite his release, Mr. Kelley-Chung's photographic equipment, and their contents, were not returned to him, but rather were retained by the MPD.

40.     The MPD refused even to provide Mr. Kelley-Chung an inventory of his property seized in connection with his arrest.  Mr. Kelley-Chung requested such an inventory, but was told directly by an officer on duty that MPD would not make out such an inventory for him.

41.     Mr. Kelley-Chung made repeated inquiries to the MPD in an effort to locate and recover his seized equipment and its contents, but they yielded neither a substantive response nor the return of his cameras or phone (or their storage media).

42.     Beginning on August 20, 2020, Mickey H. Osterreicher, NPPA's general counsel, attempted to intervene with the MPD on NPPA-member Kelley-Chung's behalf, to seek return of his cameras, phone, and the storage media within and the images and recordings they contained. Mr. Osterreicher made protracted efforts over the course of the next several weeks attempting to gain the return of Mr. Kelley-Chung's property.

43.     On August 27, 2020, in response to one of Mr. Osterreicher's attempts to secure the return of Mr. Kelley-Chung's property, MPD CID Commander Leslie Parsons stated that while no update on the progress of return of the equipment was available, search warrants "ha[d] been submitted to the USAO and are under review."  Astonished, Mr. Osterreicher replied that: "If indeed the MPD plans to pursue a search of the work product belonging to a journalist, … in the application someone [must] advise[] the magistrate that the material being sought is such and [is] protected by the Privacy Protection Act of 1980 (42 U.S.C. § 2000aa et seq.) …."  He also

asked MPD to explain the basis for its assumption that it could seize and retain a journalist's equipment or to seek a search warrant, but received no response.  A copy of Mr. Osterreicher's exchanges with MPD is Exhibit 2 to this Complaint.

44.     Mr. Osterreicher and Mr. Kelley-Chung also received no response when the former wrote MPD on September 4, 2020, to mark 20 days of their having deprived Mr. Kelley-Chung of his equipment, storage media, and the recordings and images.  In fact, after the revelation regarding the search warrants, there were no further communications from the MPD.

45.     After more than a month of silence, on October 6, 2020, Assistant U.S. Attorney ("AUSA") Paul V. Courtney of the United States Department of Justice sent a letter (directly to Mr. Kelley-Chung, without copying Mr. Osterreicher), stating that Mr. Kelley-Chung's equipment had been "recovered," and requesting that Mr. Kelley-Chung "voluntarily turn over the data" in the cameras that the MPD had seized from him and continued to retain.  A copy of the AUSA letter is Exhibit 3 to this Complaint.

46.     Undersigned counsel for Mr. Kelley-Chung responded to Mr. Courtney and confirmed that Mr. Kelley-Chung did not consent to any search or review of information or images on his cameras or phone, and that he would oppose any subpoena or other legal process seeking to obtain government access to the devices.  A copy of counsel's correspondence to the AUSA is Exhibit 4 to this Complaint.

47.     Counsel's response to the AUSA also explained that Mr. Kelley-Chung had been illegally arrested while photographing a public protest and police activity, and that his cameras and phone were seized at that time, and had since been retained, all in violation of his rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution, and in violation of the Privacy Protection Act of 1980, 42 U.S.C. § 2000aa ("PPA").

48.     Mr. Kelley-Chung not only declined the AUSA's request for access to data, but counsel demanded on his behalf return of his cameras, smartphone, and other property without further delay.  He also requested that the AUSA and MPD provide the chain of custody of the seized equipment and property, and confirmation that there had been no search of the cameras and smartphone, or of their contents or storage media.

49.     On October 22, 2020, the AUSA replied to confirm that his Office "and the MPD have been … investigat[ing] events that occurred in and around Adams Morgan … on August 13-14, 2020," and to express a "belief" that Mr. Kelley-Chung's equipment "may contain information relevant to" the investigation.  Nevertheless, the AUSA's reply also enclosed a letter to MPD indicating that DOJ had no objection to "disposition of Mr. Kelley-Chung's property in accordance with District of Columbia Code," and that he could thus pick up his seized equipment and its contents from MPD's Evidence Control Branch.  The AUSA's reply provided no chain of custody or confirmation that no search had occurred despite Mr. Kelley-Chung's requests on these points; those requests were met with complete silence.   A copy of the AUSA's reply is Exhibit 5 to this Complaint.

50.     However, the AUSA's reply did "formally request the preservation, pending potential legal process and until further written notice, of all photographs, videos, audio recordings, and other evidence, created or captured on August 13-14, 2020" as stored in Mr. Kelley-Chung's equipment or "any removable media contained therein."  The reply offered no legal basis for this request, or for Mr. Kelley-Chung's obligation to comply with it.

51.     On October 23, 2020, Mr. Kelley-Chung retrieved his equipment from the MPD – 10 full weeks after the MPD seized it.

52.     The property envelope containing Mr. Kelley-Chung's equipment that he received upon its retrieval reaffirmed that the "charges placed in connection with the property" involved alleged "Felony Rioting," but further noted MPD's admission that the charges also were based on "First Amendment Assembly."   A copy of the property envelop is Exhibit 6 to this Complaint.

53.     The Defendants' illegal conduct toward Mr. Kelley-Chung resulted from MPD policies and/or customs that disregard clearly established rights such as those held by journalists like Mr. Kelley-Chung, from MPD indifference to misconduct by MPD officers and officials, and/or failures of training and supervision to require the police to follow the law and established departmental policies.

54.     One policy Defendants should have followed was MPD's General Order on Video Recording, Photographing, and Audio Recording of Metropolitan Police Department Members, GO-304.19, effective July 19, 2012 (the "Video Recording General Order"), which ostensibly covers situations like that involving Mr. Kelley-Chung.  The policy was not followed here even though Mr. Kelley-Chung clearly identified himself as a journalist prior to his arrest.

55.     The Video Recording General Order recognizes the "First Amendment right to video record, photograph, and/or audio record MPD members … conducting official business or while acting in an official capacity in any public space, unless such recordings interfere with police activity," and that such activities are "common and lawful activities in Washington D.C."

56.     The Video Recording General Order states that "[a]s long as the photographing or recording takes place in a setting at which the individual has a legal right to be present and does not interfere with [officer] safety, members [of the police force] **shall not** … [d]emand that person's identification" or "[d]etain that person" (emphasis original).  Even if photographing or

recording impedes or interferes with police duties, officers "may direct the person to move to a position that will not interfere" but "shall not order the person to stop photographing or recording."

57.     The Video Recording General Order further provides that "[i]f a member has probable cause to believe that a camera or other recording device contains images or sounds that are evidence of criminal acts," officers "*shall request* that the person either … *[v]oluntarily* provide the device or recording medium … or … *voluntarily* transmit the images or sounds via text message or electronic mail to the member's official government electronic mail account" (emphases added).   The General Order emphasizes that "[c]onsent to take possession of a recording device or medium *must* be given *voluntarily*" and that officers "shall not, implicitly or explicitly, coerce consent to take possession of any recording device or any information thereon" (emphases added).

58.     The Video Recording General Order specifies as to recording devices and media that "[w]arrantless seizure is permissible *only* when … [t]here is probable cause to believe that the property holds contraband or evidence of a crime *and* … exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present" (emphasis added).   "Absent exigent circumstances, members shall obtain a search warrant before viewing photographs or listening to recordings on a camera or on a memory chip that has been seized." Determinations of "exigent circumstances" are supposed to be made by the Watch Commander of MPD's Civil Investigations Division (CID).

59.     Another policy relevant to Mr. Kelley-Chung's circumstance is MPD's General Order governing "Media," GO-204.01, effective April 13, 2001 (the "Media General Order"), which governs treatment of the press at "events" where "multiple arrests may occur, such as a

protest."  The Media General Order requires officials in command of such events to "[e]stablish a perimeter around the event" that nonetheless provides "news media with maximum access to the scene, without disrupting Department operations."  Similarly, MPD rules governing "Public Information During First Amendment Assemblies and Mass Demonstrations" under its Standard Operating Procedures for "Handling First Amendment Assemblies and Mass Demonstrations" ("First Amendment Assembly SOP") requires "allow[ing] media representatives reasonable access to all areas where First Amendment assemblies occur" and "reasonable accommodations to allow media representatives to use photographic, video, or other equipment … relating to their reporting of a First Amendment assembly."

60.     At the time of Mr. Kelley-Chung's unlawful arrest, Defendants Bagshaw, McCloskey and Brown, and the other Defendant John Doe Officers and Officials, failed to apply these MPD policies.  Instead, they arrested Mr. Kelley-Chung rather than treating him as a journalist, which would have entailed giving him reasonable access to the protest with reasonable accommodation to allow use of his photographic and video equipment, and/or removing him to the perimeter established (if any) under the Media General Order.

61.     Policies and/or customs of the MPD also factored into violation of Mr. Kelley-Chung's constitutional rights under its directive on "Recording, Handling and Disposition of Property Coming into the Custody of the Department," GO-601.1, effective April 30, 1992 (the "Property General Order"), which among other things, requires that, "when the decision is made not to paper a case," as was the situation with Mr. Kelley-Chung, it requires issuance of a "PD Form 81-C releasing the property" seized from the arrestee.  While the Property General Order allows classifying property as "evidence," it states that "when cases are disposed of in court … by dismissal of the charges," the standard procedure is to "advise the claimant(s) to make

arrangements for the return of the property."  The MPD's "Records Retention" rules under its First Amendment Assembly SOP require the same.

62.     Not only does the Property General Order not require any special care with regard to seized property comprised of implements or outputs of First Amendment activity, based on the MPD's retention of Mr. Kelley-Chung's photographic equipment and images and recordings, and its tacit (and potentially explicit) agreement to defer return until receiving approval from officials like AUSA Courtney, it is District of Columbia and MPD policy to seize and retain cameras and recording media based simply on a "belief" that they might contain information relevant to any investigation.

63.     On information and belief, at all times relevant to this complaint, the District of Columbia has had a policy, custom and practice of failing to supervise and discipline officers who obstruct and/or prevent members of the media and public from recording public events and associated police activity conducted in public view, despite its awareness that these violations happen.

64.     On information and belief, repeated failure to supervise and discipline shows the District of Columbia's and the MPD's deliberate indifference to the First Amendment rights of the press and public to record police conduct in public.

65.     The District of Columbia's and the MPD's policy of retaining press-member arrestees' photographic equipment and storage media post-release shows deliberate indifference to the constitutional rights surrounding property that consists of implements and outputs of First Amendment activity.

66.     The constitutional violations Mr. Kelley-Chung suffered at the hands of the MPD and its officers were caused by (a) the District of Columbia's unconstitutional practices and

policy; (b) the District of Columbia's failure to enforce the training it provides its officers about the First Amendment right of the press and public to record public events and associated police activity from public locations, and about the rights held in implements and outputs of First Amendment activity; and (c) the District of Columbia's failure to supervise and discipline officers to prevent them from improperly and unlawfully obstructing and/or preventing individuals from recording public events and associated police activity in public locations.

67.     The Defendant MPD Officers and Officials callously disregarded Mr. Kelley-Chung's rights – and their own sworn obligation to uphold the law – and knowingly deprived him of his First Amendment rights as a journalist, as well as his rights to due process and to be free from unreasonable search and seizure.

68.     As a direct result of the illegal arrest and seizure of his equipment, Mr. Kelley-Chung was forced to replace his cameras and related equipment in order to continue in his occupation as a photojournalist, at a cost to him of several thousand dollars.  Additionally, Mr. Kelley-Chung was forced to purchase two new cell phones, and to outlay costs for prepaid cell phone plans, in connection with which he has had to twice change the phone numbers assigned to them, as a precaution against improper MPD searches of his personal data.  Additionally, Mr. Kelley-Chung was rendered unable to license any of the images or recordings on the seized cameras and their storage for a period over two months, at which time their timeliness and news-worthiness were greatly diminished.  All of these disruptions directly affected Mr. Kelley-Chung's income as a freelance journalist and infringed his First and Fourth Amendment rights.

69.     The seizure of Mr. Kelley-Chung's photographic equipment and cellphone, and their contained storage media, and the failure to promptly return that property upon his release from custody, was undertaken maliciously without due process or probable cause.

70.     As a result of his arrest and detention, Mr. Kelley-Chung suffered psychological trauma, increased anxiety, flashbacks, and weeks of nightmares.

## COUNT I

**Section 1983 Claim for Violation of Plaintiff's First and Fourteenth Amendment Rights**
(ALL DEFENDANTS)

71.     Mr. Kelley-Chung repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

72.     Observing and recording police activity in public is fully protected by the free speech and free press clauses of the First Amendment to the United States Constitution, as applied to the District of Columbia under the Fourteenth Amendment.

73.     By arresting Mr. Kelley-Chung without probable cause, and thereafter detaining him, while he was recording protest and police activity in public, the Defendant MPD Officers violated Mr. Kelley-Chung's clearly established First Amendment rights.

74.     The seizure of and prolonged failure to return Mr. Kelley-Chung's photography equipment, storage media, and images and recordings they contained violated Mr. Kelley-Chung's clearly established First Amendment rights.

75.     The Defendant MPD Officers and Officials violated a clearly established constitutional right of which all MPD police officers knew, or of which reasonable law enforcement officers should have known, rendering them liable to Mr. Kelley-Chung under 42 U.S.C. § 1983.

76.     The Officers acted with reckless and callous indifference to Mr. Kelley-Chung's First Amendment rights.

77.     The denial of constitutional rights is irreparable injury per se, and Mr. Kelley-Chung is entitled to declaratory and injunctive relief.

78.     As a direct and proximate result of the actions of the MPD Officers and Officials, Mr. Kelley-Chung suffered psychological trauma, increased anxiety, flashbacks, and weeks of nightmares, as well as economic and professional injuries.

79.     As a direct and proximate result of all of the violations of Mr. Kelley-Chung's First Amendment rights, he suffered damages, including:

      a.     Damage to his personal and professional reputation;

      b.     Loss of earnings and earning capacity;

      c.     Psychological and emotional injury, past and future; and

      d.     Degradation, humiliation, mental anguish, suffering and embarrassment.

<u>COUNT II</u>
**Section 1983 Claim for Violation of Plaintiff's Fourth and Fourteenth Amendment Rights**
(ALL DEFENDANTS)

80.     Mr. Kelley-Chung repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

81.     Under the Fourth Amendment to the United States Constitution, as applied to the District of Columbia under the Fourteenth Amendment, Mr. Kelley-Chung has a right to be free from unreasonable searches and seizures.

82.     The Defendant MPD Officers violated Mr. Kelley-Chung's clearly established Fourth Amendment right to be free from unreasonable seizures by arresting and detaining Mr. Kelley-Chung, and by seizing his photography equipment, storage media, and images and recordings they contained, without probable cause to believe Mr. Kelley-Chung was engaged in any criminal activity. *Robbins v. City of Des Moines*, --- F.3d ---, 2021 WL 28091 (8th Cir. Jan. 5, 2021).

83.     The MPD Doe Officials violated Mr. Kelley-Chung's clearly established Fourth Amendment right to be free from unreasonable seizures by retaining after his release from

custody Mr. Kelley-Chung's photography equipment, storage media, and images and recordings they contained, without probable cause or legal justification to retain the property; this unlawful retention of Mr. Kelley-Chung's property endured for a period of 10 full weeks.

84.     The conduct of the Officers and Officials violated clearly established constitutional rights of which all MPD police officers knew, or of which reasonable police officers should have known, rendering them liable to Mr. Kelley-Chung under 42 U.S.C. § 1983.

85.     The Officers and Officials acted with reckless and callous indifference to Mr. Kelley-Chung's First and Fourth Amendment rights.

86.     The denial of constitutional rights is irreparable injury per se, and Mr. Kelley-Chung is entitled to declaratory and injunctive relief.

87.     As a direct and proximate result of the actions of the MPD Officers and Officials, Mr. Kelley-Chung suffered psychological trauma, increased anxiety, flashbacks, and weeks of nightmares, as well as economic and professional injuries.

88.     As a direct and proximate result of all of the violations of Mr. Kelley-Chung's Fourth Amendment rights, he suffered damages, including:

     a.     Damage to his personal and professional reputation;

     b.     Loss of earnings and earning capacity;

     c.     Psychological and emotional injury, past and future; and

     d.     Degradation, humiliation, mental anguish, suffering and embarrassment.

### COUNT III
### Section 1983 *Monell* Claim
(DEFENDANT DISTRICT OF COLUMBIA)

89.     Mr. Kelley-Chung repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

90.     In arresting Mr. Kelley-Chung while he was filming protest and police activity in public, and seizing and retaining his photography equipment, storage media, and images and recordings they contained, the Defendant MPD Officers and Officials violated Mr. Kelley-Chung's clearly established rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

91.     At all times relevant to this complaint, the Officers and Officials were acting under color of the laws of the District of Columbia.

92.     At the time of Mr. Kelley-Chung's unlawful arrest, the MPD's "official" policy required MPD officers to allow photography and recording in settings in which an individual has a legal right to be present so long as it does not interfere with police officer safety.  Detention of such individuals, or demands that they produce identification are not permitted.

93.     At the time of Mr. Kelley-Chung's unlawful arrest, the MPD's "official" policy for "events" such as the George Floyd and police-brutality protests was to establish a perimeter but to allow the news media "maximum access" that is reasonably possible.

94.     Nonetheless, the Defendant Officers interfered with and prevented Mr. Kelley-Chung's activities as a journalist and documentarian by arresting him and by confiscating his photography equipment, storage media, and images and recordings they contained.

95.     At all times relevant to this complaint, notwithstanding its written policies on the subject, the District of Columbia had a custom and practice of allowing MPD officers to obstruct and/or prevent members of the media and public from recording protest and police activity in public locations, in violation of the First Amendment, as evidenced by the actions of Defendants Bagshaw, McCloskey and Brown, and of the Defendant John Doe Officers, whose conduct the MPD effectively sanctioned and endorsed.

96.     On information and belief, the District of Columbia failed to supervise and discipline its officers for unlawfully interfering with the First Amendment right of the public and press to record public scenes of police activity, displaying deliberate indifference to its citizens' constitutional rights.

97.     At the time of Mr. Kelley-Chung's unlawful arrest, the MPD's "official" policy in its Video Recording General Order prohibited the warrantless seizure of property such as Mr. Kelley-Chung's photography equipment, storage media, and the images and recordings they contained, unless there was probable cause to believe the property holds contraband or evidence of a crime and either the exigencies of the circumstances, or some other recognized exception to the warrant requirement, demands seizure of the property.

98.     Otherwise, if officers have probable cause to believe a camera or other device contains images or sounds are evidence of criminal acts, they may only *request* the *voluntary* surrender of the device or recording medium, or that the owner transmit the images or sounds to the officer.  Such consent must be given voluntarily and officers may not force the surrender of possession of any recording device or any information thereon.  Absent exigent circumstances, determinations of which must be made by the CID Watch Commander, officers must obtain a search warrant before viewing photographs or listening to recordings on a camera or memory chip that has been seized.

99.     The MPD's "official" policy also requires that when a decision is made to not paper a case, as with Mr. Kelley-Chung, personal property of the arrestee is to be returned.

100.    The MPD's policy makes no accommodation for seized property that comprises implements or outputs of First Amendment activity, and despite its "official" policy, the MPD's custom and practice allows such First Amendment-protected property to be retained for months,

notwithstanding that doing so prevents its owner's use in exercising free speech and press rights protected by the United States Constitution.

101.   Despite official MPD policies, in connection with Mr. Kelley-Chung's arrest, the Defendant Officers seized his photography equipment, storage media, and images and recordings they contained, and the Defendant Police Officials retained that property for 10 weeks after Mr. Kelley-Chung's release.

102.   At all times relevant to this complaint, notwithstanding its written policies on the subject, the District of Columbia had a custom and practice of allowing MPD officers to seize such equipment and recordings, in violation of the First Amendment, as evidenced by the actions of Defendants Bagshaw, McCloskey and Brown, and of the Defendant John Doe Officers, whose conduct the MPD effectively sanctioned and endorsed.

103.   On information and belief, the District of Columbia failed to adequately train its officers in its Video Recording General Order, in its Property General Order or with respect to the First and Fourth Amendment rights of the public and press in their photography equipment, storage media and audiovisual recordings, displaying deliberate indifference to its citizens' constitutional rights.

104.   On information and belief, the District of Columbia failed to supervise and discipline its officers for unlawfully interfering with the First and Fourth Amendment rights of the public and the press in photography equipment, storage media and audiovisual recordings, displaying deliberate indifference to its citizens' constitutional rights.

105.   These unconstitutional policies, customs and practices of the District of Columbia were the moving force behind the violation of Mr. Kelley-Chung's constitutional rights by the John Doe Officers and Officials and the MPD.

106.   As a direct and proximate result of the District of Columbia's unconstitutional policies, customs and practices, Mr. Kelley-Chung suffered damages, including:

     a.     Damage to his personal and professional reputation;

     b.     Loss of earnings and earning capacity;

     c.     Psychological and emotional injury, past and future;

     d.     Degradation, humiliation, mental anguish, suffering and embarrassment.

## COUNT IV
### Section 2000aa Claim – Privacy Protection Act of 1980
(ALL DEFENDANTS)

107.   Mr. Kelley-Chung repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

108.   The seizure of Mr. Kelley-Chung's photography equipment, storage media, and images and recordings they contained by the MPD Officers constituted a search and/or seizure of work product materials from Mr. Kelley-Chung, whom the officers were aware was a photojournalist.

109.   This seizure of Mr. Kelley-Chung's photography equipment, storage media, and images and recordings they contained by the MPD Officers, and the ensuing deprivation for over 10 weeks while the MPD Officials retained the property, violated the Privacy Protection Act of 1980, 42 U.S.C. § 2000aa.

110.   The Officers and other members of the MPD who had access to Mr. Kelley-Chung's photography equipment, storage media, and images and recordings they contained, acted with reckless and callous indifference to Mr. Kelley-Chung's federally protected rights.

111.   By reason of these seizures of his photography equipment, storage media, and images and recordings they contained, Mr. Kelley-Chung suffered actual damages, including the loss of licensing fees from his inability to license time-sensitive footage to news organizations.

## COUNT V
### False Arrest and False Imprisonment
(ALL DEFENDANTS)

112.    Mr. Kelley-Chung repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

113.    The Defendant MPD Officers Bagshaw, McCloskey and Brown, and the MPD John Doe Officers, were on notice and informed that Mr. Kelley-Chung was a photojournalist covering the protest activity that the Officers were monitoring.

114.    The Officers,  who could not have had a reasonable belief held in good faith that their conduct was lawful, nor any rational  reason  to believe  Mr. Kelley-Chung was commit- ting any crime or was about to commit any crime, nonetheless approached Mr. Kelley-Chung and placed him under arrest.

115.    Mr. Kelley-Chung's arrest was made without a warrant or legal justification.

116.    Mr. Kelley-Chung's arrest was made without probable cause.

117.    The fact that Mr. Kelley-Chung was recording protest activity and/or police action did not constitute probable cause needed to make a warrantless arrest, nor did it provide legal justification for the arrest.

118.    The Officers intended to confine Mr. Kelley-Chung and deprive him of his liberty when they arrested and placed him in police custody without probable cause under any objective standard.

119.    These actions were flagrant, malicious, willful, wanton and reckless, and dis- played a high degree of moral culpability.

120.    The Officers' conduct was committed within the scope of their employment by the District of Columbia, and their actions were approved, consented to, and ratified by superior officers of the MPD acting within the scope of their employment.

121.    As a direct and proximate result of the foregoing, Mr. Kelley-Chung suffered damages, including:

      a.      Damage to his personal and professional reputation;

      b.      Loss of earnings and earning capacity;

      c.      Psychological and emotional injury, past and future; and

      d.      Degradation, humiliation, mental anguish, suffering and embarrassment.

**COUNT VI**
**Conversion**
(ALL DEFENDANTS)

122.    Mr. Kelley-Chung repeats and realleges the allegations in the foregoing Paragraphs as if fully set forth herein.

123.    The Defendant Officers Bagshaw, McCloskey and Brown, and the MPD John Doe Officers who arrested Mr. Kelley-Chung, seized personal property consisting of a Nikon D7100 camera body with an SD card and an 18-140mm lens, a Fuji XT3 camera body with an SD card and 18-55mm lens, and a black Samsung Galaxy S10e smartphone, all of which were in Mr. Kelley-Chung's rightful possession.

124.    The Officers' August 13, 2020 seizure of Mr. Kelley-Chung's photography equipment, storage media, and the images and recordings they contained constituted unlawful exercise of control and dominion over same, thereby depriving Mr. Kelley-Chung of his rights to his property.

125.    The MPD John Doe Officials wrongfully retained Mr. Kelley-Chung's photography equipment, storage media, and the images and recordings they contained upon his release from custody on August 14, 2020, and thereafter refused to surrender the equipment to him for ten weeks, until October 23, 2020, thus depriving Mr. Kelley-Chung of his rights to his property.

126.   The MPD's seizure of Mr. Kelley-Chung's property and subsequent retention of it for a period of ten weeks was a substantial deprivation of chattel of which Defendants were in wrongful possession throughout that period.

127.   As a direct and proximate result of the foregoing, Mr. Kelley-Chung suffered damages, including:

      a.     Loss of earnings and earning capacity; and

      b.     Costs incurred to replace the equipment, and to protect against further incursion by MPD personnel, to allow continued functioning in his occupation as a photojournalist.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kian Kelley-Chung requests relief as follows:

(a)   A declaratory judgment that Mr. Kelley-Chung's arrest for recording public protest and police activity in a public location, and seizure of his equipment, violated his clearly established constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution;

(b)   A declaratory judgment that the confiscation and ensuing ten-week retention of Mr. Kelley-Chung's photography equipment, storage media, and images and recordings they contained, violated his clearly established constitutional rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and the Privacy Protection Act, 42 U.S.C. § 2000aa;

(c)   An award of compensatory damages against defendants jointly and severally, in an amount to be determined by a jury at trial, for damages Mr. Kelley-Chung suffered in the form of deprivation of his First Amendment rights; diminished personal and professional reputation; lost earnings and earning capacity;

psychological and emotional injury; and degradation, humiliation, mental anguish, suffering and embarrassment;

(d)    Pursuant to 42 U.S.C. § 2000aa-(6)(a) and (f), an award against the defendants jointly and severally of actual damages, in an amount to be determined by a jury at trial, as suffered by Mr. Kelley-Chung as result of the unlawful seizure of his photography equipment, storage media, and images and recordings they contained;

(e)    Punitive damages in an amount to be determined by a jury at trial;

(f)    Injunctive relief (i) barring the District of Columbia from arresting, detaining, obstructing or otherwise interfering with journalists and members of the public who are engaged in recording protest and police activity in public places; and (ii) directing the District of Columbia to develop and implement, with the Court's oversight, appropriate training and procedures to test its effectiveness on the ground and for appropriately disciplining those who breach their training;

(g)    Injunctive relief (i) barring the District of Columbia from improperly and unconstitutionally seizing, retaining and/or searching property that comprises implements or outputs of First Amendment activity; and (ii) directing the District of Columbia to develop and implement, with the Court's oversight, an effective, comprehensive policy to protect the First and Fourth Amendment rights of the press when property is seized from them in connection with arrests and/or detention;

(h)    Pursuant to 42 U.S.C. §§ 1988 and 2000aa-6(f), an award of the costs and expenses of prosecuting this action, including reasonable attorney's fees; and

(i)      Such other relief that this Court may deem just, proper, and appropriate.

DATED:  January 13, 2021.

By:       /s/ Robert Corn-Revere
        Robert Corn-Revere (DC Bar #375415)
        bobcornrevere@dwt.com
        Ronald G. London (DC Bar #456284)
        ronnielondon@dwt.com
        DAVIS WRIGHT TREMAINE LLP
        1301 K Street, N.W., Suite 500 East
        Washington, D.C. 20005
        Telephone:  (202) 973-4200

        Counsel for Plaintiff

## **JURY TRIAL DEMAND**

Plaintiff hereby requests a trial by jury on all paragraphs and counts.

/s/ Robert Corn-Revere